UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
GRIGORY KRAVTSOV, IRNA KRAVTSOV, DIANA
KRAVTSOV, CAMILLA KRAVTSOV, and
REBECCA KRAVTSOV,

         Plaintiffs,      **OPINION AND ORDER**

    - against -       10-CV-3142 (CS)

TOWN OF GREENBURGH, JOHN DOES ONE
THROUGH TEN, intended to be GREENBURGH
COURT OFFICERS, and TOWN OF GREENBURGH
EMPLOYEES involved in and responsible for the acts
alleged herein,

         Defendants.
-------------------------------------------------------------------x

Appearances:

Mitchell Ian Weingarden
Law Offices of Mitchell I. Weingarden, PLLC
White Plains, New York
*Counsel for Plaintiffs*

Carl S. Sandel
Drew W. Sumner
Morris Duffy Alonso & Faley
New York, New York
*Counsel for Defendants*

Seibel, J.

   Before the Court is Defendants' motion for summary judgment, (Doc. 13), and Plaintiffs'

cross-motion for sanctions, leave to amend the Amended Complaint ("Am. Compl."), (Doc. 9),

leave to file a late notice of claim pursuant to New York General Municipal Law § 50-e, and

summary judgment, (Doc. 17). For the following reasons, Defendants' motion is GRANTED IN

PART and DENIED IN PART, and Plaintiff's motions are, respectively, GRANTED,

GRANTED IN PART and DENIED IN PART, DENIED, and DENIED.

I.     **Background**

The following facts are undisputed except where noted.[1]

1.     Plaintiff's Medical Condition

Plaintiff[2] was born in the Ukraine in 1960 and immigrated to the United States in 1980.
(Kravtsov Aff. ¶ 3.)[3]  He is Jewish, wears a kippah (also known as a yarmulke), and speaks with
a pronounced Ukrainian accent.  (*Id.*)  Due to cancer and other conditions, he has had several
operations on his digestive system.  (*Id.* ¶ 4.)  In October 2005, he underwent a total gastrectomy
(removal of his stomach), removal of his gastroesophageal sphincter, removal of his duodenum
(part of his small intestine), and reconstruction of his bile and pancreatic ducts.  (*Id.* ¶¶ 4–5.)  As
a result of his surgeries, he now suffers from dumping syndrome, explosive diarrhea, non-
digested nutrient contamination followed by arthritic inflammation, hypoglycemia, and other
symptoms.  (*Id.* ¶ 6.)  These symptoms are triggered by stress and eating too quickly or while in
an erect position, among other ways.  (*Id.* ¶ 7.)

Because of Plaintiff's condition, he must eat eight to ten times a day.  (*Id.* ¶ 12.)  To
reduce the risk of cramping, pain, and explosive diarrhea, he must eat in a reclining or semi-

---

[1]     Counsel for both parties have failed to abide by my Individual Practices, which require that a party
opposing summary judgment reproduce each entry in the moving party's Local Rule 56.1 Statement and set out the
opposing party's response directly beneath it.  (*See* Plaintiff's Counter Statement of Material Facts Pursuant to Local
Rule 56.1 ("P's 56.1"), (Doc. 20); Defendant's Counter-Statement of Material Facts Pursuant to Local Rule 56.1
("Ds' Reply 56.1"), (Doc. 25).)  I will excuse these failures in the interest of deciding the matter on the merits.  In
the future, however, I expect counsel to comply with that provision.  Additionally, it would be more helpful to the
Court if Plaintiffs specified their version of events rather than simply stating that Defendants' version is "in
dispute."  (*See* P's 56.1 ¶¶ 13, 16, 17.)

[2]     "Plaintiff" refers to Grigory Kravtsov, unless otherwise noted.  I will refer to Plaintiff's wife and children
as such, even though they are also named plaintiffs in this case, because most of this opinion pertains to Plaintiff
alone.

[3]     "Kravtsov Aff." refers to the Affidavit of Grigory Kravtsov in Opposition to Defendants' Motion for
Summary Judgment and in Support of Plaintiffs' Motion for Assorted Relief.  (Attorney Mitchell I. Weingarden's
Declaration in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Motion for
Assorted Relief ("Weingarden Decl."), (Doc. 19), Ex. 1.)

reclining position and continue to recline for ten to fifteen minutes or more afterwards.  (*Id.* ¶¶ 15-16.)  He cannot eat food that is hard or difficult to digest.  (*Id.* ¶ 8.)  The only types of food he can tolerate include parboiled, minced vegetables and bland fish, vegetable juices, boiled kasha-style grains, and ripe bananas, grapes, or fruit juice for immediate sugar when he begins to feel the effects of hypoglycemia.  (*Id.* ¶ 8.)  According to Plaintiff, he can tolerate larger portions of food and more types of food if he is at home in a restful, stress-free environment and reclining in a dark room, but as his stress level rises, the amount and types of foods that he can tolerate decrease "proportionately" and the symptoms described above increase "exponentially."  (*Id.* ¶ 9.)  His main source of nutrition, other than supplements, is a liquefied, predigested "medical food" consisting of parboiled and minced vegetable soups, with added digestive enzymes and other nutrients.  (*Id.* ¶ 10.)

### 2.   The Events at the Greenburgh Town Court

On April 6, 2009, Plaintiff appeared at the Greenburgh Town Court (the "Town Court") in response to a traffic summons that he was issued in the Town of Greenburgh (the "Town") earlier in 2009.  (*See* Ds' 56.1 ¶ 1.)[4]  According to Plaintiff, he arrived at 2 p.m. for this conference, which was scheduled for 3 p.m. and concluded at 4:07 p.m.  (*See* April 6, 2009 Hr'g Tr. 4, 7.)[5]  Ultimately, Plaintiff received an adjournment to August 17, 2009.  (*See* Ds' 56.1 ¶¶ 2-4; April 6, 2009 Hr'g. Tr. 6.)  On August 17, 2009, Plaintiff entered the courthouse with a bag containing his court papers and containers of his medical food.  (*See* Ds' 56.1 ¶¶ 5-6; P's 56.1 ¶

---

[4]   "Ds' 56.1" refers to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1.  (Doc. 16.)  Citation in this opinion to a paragraph in Defendants' 56.1 alone indicates that Plaintiffs did not address Defendants' entry in their 56.1 statement, and thus I consider Defendants' statements undisputed (so long as they are supported by the record).  *See* Fed. R. Civ. P. 56(c), (e).

[5]   "April 6, 2009 Hr'g Tr." refers to the transcript of the April 6, 2009 conference before the Honorable Doris T. Friedman.  (Attorney Carl Sandel's Declaration in Support of Motion for Summary Judgment ("Sandel Decl."), (Doc. 15), Ex. D.)

6; Kravtsov Dep. 17.[6])  At the security checkpoint, Plaintiff was instructed to open his bag for inspection.  (*See* Ds' 56.1 ¶ 8; Kravtsov Dep. 18.)  David Pinn, a court officer, then told Plaintiff that food was not allowed into the courtroom.  (*See* Ds' 56.1 ¶ 9; Kravtsov 50-h Tr. 28;[7] Pinn Dep. 153.[8])

Plaintiff has provided conflicting versions of what happened next.  At his examination pursuant to New York General Municipal Law Section 50-h, he said he did not object or "question [the] righteousness" of the instruction that food was not allowed in the courtroom and that in a "very amicable" conversation involving "no confrontation whatsoever," he asked where he could leave his food and was told he could leave it on a table at the checkpoint.  (Kravtsov 50-h Tr. 60-61.)  At his deposition, Plaintiff said he then explained the nature of his disability and that he was disabled under the Americans with Disabilities Act.  (*See* Kravtsov Dep. 35, 37.)  He acknowledged, however, that his "being Jewish ha[d] absolutely nothing to do with" his not being allowed to bring food into the courtroom.  (*Id.* at 45.)  In a declaration submitted in connection with the instant motions, however, Plaintiff claims that Pinn "treated [him] badly and made very sure to tell [Plaintiff] that [he] would not receive special treatment," and that "[a]lthough [Pinn] did not make anti-Semitic remarks, it appeared by his comments and demeanor that [Plaintiff's] accent and kippah played a part in [Pinn's] bad treatment of [him]."  (Kravtsov Aff. ¶¶ 31-32.)[9]  At his deposition, Pinn did not remember if Plaintiff explained his

---

[6]      "Kravtsov Dep." refers to the February 11, 2011 Examination Before Trial of Grigory Kravtsov.  (Sandel Decl. Ex. B; Weingarden Decl. Ex. 3.)

[7]      "Kravtsov 50-h Tr." refers to the transcript of the January 28, 2010 50-h Examination of Grigory Kravtsov. (Sandel Decl. Ex. C.)

[8]      "Pinn Dep." refers to the April 6, 2011 Deposition of David Pinn.  (Weingarden Decl. Ex. 4.)

[9]      Plaintiff may not submit an affirmation in connection with a motion for summary judgment that conflicts with earlier deposition testimony, and thus the conflicting portions of Plaintiff's affirmation – Plaintiff's statement suggesting that his race and national origin played a part in Pinn's treatment of him – will be disregarded.  *See*

disability, why he needed to bring his food into court, or that he was disabled under the Americans with Disabilities Act, but testified that Plaintiff would not have been allowed to bring his food into court unless he got permission from someone else in the courthouse, regardless of any explanation Plaintiff offered. (*See* Pinn Dep. 155-56.)

Plaintiff then left his bag at the security checkpoint and proceeded into the courthouse without his food. (*See* Ds' 56.1 ¶ 11.) He attended a conference with a representative from the Town Attorney's office, and then left the courthouse with his bag and went outside. (*See id.* ¶ 12; Kravtsov Dep. 73.)[10] At this time, Plaintiff felt dizzy and nauseous but found a grassy area near the parking lot where he could sit and take his food. (*See* Kravtsov Dep. 74-75.) Plaintiff was able to take one small swallow, (*see* Kravtsov Aff. ¶ 41),[11] before Pinn appeared and told him, "Get up.  Pick up your stuff.  You cannot sit here.  You cannot eat here.  Just get up," (Kravtsov Dep. 78).  Pinn testified that he told Plaintiff that he could not sit in the area behind the courthouse for security reasons but could sit on a set of stairs that Pinn could see. (*See* Pinn Dep. 193-94.)  According to Pinn, Plaintiff could have been doing anything behind the building, including planting a bomb. (*See id.* at 194.)

---

*Ramos v. Baldor Specialty Foods, Inc.*, No. 10-CV-6271, 2011 WL 2565330, at *4 (S.D.N.Y. June 16, 2011) (contradictory declaration not subject to cross-examination and runs afoul of rule that a party may not create a material issue of fact on summary judgment by submitting contradictory declarations); *see also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony.") (alteration and internal quotation marks omitted).  In any event, Plaintiff's statement in his affirmation regarding Pinn's supposed motivations is entirely speculative and conclusory.

[10]     P's 56.1 indicates disagreement with the order of events and timing as stated by Defendants. (*See* P's 56.1 ¶ 13.)  Plaintiff's lengthy string cite to the record is not helpful, as it leaves the Court to decipher Plaintiff's version of events with no explanation.  In any event, I do not find the order and timing of these events to be material, and Defendants' version is supported by Plaintiff's deposition testimony.

[11]     At his deposition, he was not able to remember whether he took any food at this point. (*See* Kravtsov Dep. 77.)

Plaintiff walked with the officer back towards the courthouse entrance, but stopped and said that he could not wait to see the judge without taking his food. (*See* Kravtsov Dep. 81.) The officer responded that no food was allowed in the courtroom, but told Plaintiff that he could eat on the steps. (*See id.*; Pinn Dep. 201-02.) According to Plaintiff, "he pointed [to] the steps . . . but with such a smirk and such a derogative connotation that . . . what he really meant [was] . . . that there [was] absolutely no place . . . [he could] sit and eat." (Kravtsov Dep. 81–82.) Plaintiff also said that the area in which the officer indicated Plaintiff could eat, on the courthouse steps near the door, was not in the shade, although Plaintiff cannot remember whether he told the officer that he needed to be in the shade when eating. (*See id.* at 82.)[12] According to Pinn, Plaintiff mentioned that he could not eat in the sun, and he then told Plaintiff that he could sit on a different set of stairs under an awning and in the shade. (*See* Pinn Dep. 193.)

Eventually, Plaintiff went back into the courthouse and appeared before the court, obtaining an adjournment of his trial to October 26, 2009. (Ds' 56.1 ¶¶ 18-19.)[13] On October 26, prior to appearing for trial, Plaintiff prepared himself at home so as to minimize the chance that he would need to take his food into the courtroom, although he was unable to remember at his 50-h examination whether he actually ate any of his food at the courthouse that day. (*See id.* ¶ 21; Kravtsov 50-h Tr. 85-86.) On October 26, 2009, Plaintiff appeared for his trial at the courthouse, was convicted, and was ordered to pay a fine. (*See* Ds' 56.1 ¶¶ 18-19.)

---

[12] The record is unclear as to whether Plaintiff ate any more of his food.

[13] The record is unclear as to whether Plaintiff was allowed to take his food into the courtroom on October 26, 2009, (*see* Pinn Dep. 203-04), but given Pinn's position on food in the courthouse described above, I assume he was not.

3.   <u>Video Surveillance at the Town Court</u>

The Town Court is equipped inside and outside with video surveillance cameras, which record only video, not audio. (Marasse Aff. ¶ 4.)[14] There is a camera on the top landing of the steps in front of the courthouse, two cameras in the lobby area, one camera in the courtroom, and two cameras in a back office area. (*See* Pinn Dep. 83; *see also* Weingarden Decl. Exs. 11a-c (camera screenshots of what appears to be the security screening area with a metal detector, the front landing, and the back office area). On or about October 20, 2009, Richard Marasse, a Deputy Town Attorney representing the Town in this case as indicated on the docket, received a handwritten notice of claim from Plaintiff that included a request that the Town produce copies of video recordings from the surveillance cameras which, according to the notice, "show[] that on August 17, 2009, around Noon Time P.O. #501 chased and harassed [Plaintiff] outside of the court." (Marasse Aff. ¶¶ 1-2; *see* Weingarden Decl. Ex. 9 ("August 17th Notice").) On November 10, 2009, the Office of the Town Attorney received a more formal notice of claim from Plaintiff's attorney, which did not include a request for video, but did offer a general description of Plaintiff's claim similar to that in Plaintiff's handwritten October 20th notice, stating that on August 17, 2009, Plaintiff was "publically [*sic*] accosted physically and verbally by a Greenburgh Employee, believed to be a Court Officer" and not allowed to take "essential medicine in a timely manner." (Sandel Decl. Ex. G; *see also* August 17th Notice 5-6 (harassment included preventing Plaintiff from taking his food).) The November 10th notice alleged claims of discrimination on the basis of disability, national origin, and religion, assault, unlawful imprisonment, and denial of a reasonable accommodation for Plaintiff's disability. (*See* Sandel Decl. Ex. G.)

---

[14]   "Marasse Aff." refers to the Affirmation of Richard Marasse. (Doc. 24.)

On January 28, 2010, at Plaintiff's 50-h examination, Plaintiff's attorney requested of Marasse that all relevant video be preserved and exchanged. (Marasse Aff. ¶ 3.) After this discussion, Marasse requested that Frank Dellacio, a civilian employed by the Town Police Department, make a recording of the video surveillance beginning at 10:30 a.m. on August 17, 2009, the date of the incident. (*Id.* ¶ 5.) Dellacio then recorded the video beginning at 10:30 a.m. on the date of the incident, as indicated by the time stamp of the video. (*Id.* ¶ 6.) Ultimately, Plaintiff received the requested video on March 25, 2011. (*See* Weingarden Decl. Ex. 10.)

As Marasse explains by affidavit, however, unbeknownst to Dellacio, Marasse, and the court administrator, the video surveillance system's time stamp was set to Pacific Standard Time. (*See* Marasse Aff. ¶ 3.) Marasse believes that Pacific Standard Time was the default setting and that the system had never been set to Eastern Standard Time. (*Id.*) As a result, the recording made by Dellacio captured video beginning at 1:30 p.m. Eastern time, after the alleged events occurred. (*Id.* ¶ 7.) By the time Defendants realized the error, the video surveillance of August 17, 2009 had been automatically destroyed by the system. (*Id.* ¶ 9.) According to Marasse, the video surveillance system stores a maximum amount of video, and once that maximum is reached, the oldest video is then replaced with the most current video. (*Id.* ¶ 10.)

4.    Procedural Posture

On April 14, 2010, Plaintiff filed the Complaint against the Town, the Town Court, and ten John Does intended to be Town Court officers and Town employees (the "Individual Defendants"). (Doc. 1.) On October 1, 2010, I terminated the Town Court as a defendant and permitted Plaintiff to amend the Complaint. (*See* October 1, 2010 Minute Entry.) On October 22, 2010, Plaintiff filed the Amended Complaint against the remaining Defendants, alleging nine causes of action: (1) disability discrimination under Title II of the Americans with Disabilities

Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, (2) violations of Plaintiff's rights under the Constitution and laws of the United States, made actionable by 42 U.S.C. § 1983, "including but not limited to" his "fundamental constitutional right to access the Courts" and his rights to substantive and procedural due process and equal protection under the Fourteenth Amendment, (3) religious and racial discrimination under 42 U.S.C. § 1981, (4) violation of his rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, (5) violation of his rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, (6) discrimination on the basis of disability, religion, and national origin under Article 15 of New York Executive Law (New York Human Rights Law ("NYHRL")) § 296, (7) assault and battery, (8) unlawful imprisonment, and (9) negligent policymaking, hiring, training, and supervising. (Am. Compl. 8-17.) In the tenth and eleventh causes of action, respectively, Plaintiff's wife alleges loss of marital benefits, and Plaintiff's children allege loss of consortium. (*Id.* 17-18.) Defendants have moved for summary judgment on some of Plaintiff's claims, (*see* Ds' Mem.),[15] discussed in more detail below, and Plaintiff has cross-moved for sanctions due to the spoliation of the video surveillance, (*see* P's Mem. 12-31),[16] as well as for summary judgment on his second and ninth causes of action, (*see id.* at 31-36). Plaintiff also requests leave to substitute Pinn as John Doe One and Cecile Sia, the Town Court Clerk, (*see* Weingarden Aff. Ex. 12 ¶ 14), as John Doe Two, (*see* P's Mem. 35-36).

---

[15]     "Ds' Mem." refers to Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment. (Doc. 14.) Defendants' memoranda in support of their motion and in reply to Plaintiff's opposition are far from clear as to which of Plaintiff's claims they are challenging.

[16]     "P's Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Motion for Sanctions Due to Defendants' Spoliation of Material Evidence, Leave to Amend the Caption of This Action and for Issuance of a Supplemental Summons, in the Event the Court Determines that There is an Insufficiency in Plaintiffs' Notice of Claim, Leave to Correct, Amend or File a Late Notice of Claim. (Doc. 18.)

II.    **Plaintiff's Cross-Motion for Sanctions**

Based on the spoliation of the video from April 17, 2009, Plaintiff seeks sanctions of

varying severity:  default judgment against all Defendants on all counts, "preclusion of all

evidence which might have appeared" on the missing video, an adverse inference at trial, and

related costs and fees.  (*See* P's Mem. 34.)  I first address whether Plaintiff is entitled to

spoliation sanctions, and then determine which sanctions are appropriate.

A.    **Spoliation Sanctions**

To make out a spoliation claim, the party seeking sanctions must

> establish (1) that the party having control over the evidence had an obligation to
> preserve it at the time it was destroyed; (2) that the records were destroyed with a
> culpable state of mind; and (3) that the destroyed evidence was relevant to the
> party's claim or defense such that a reasonable trier of fact could find that it
> would support that claim or defense.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (internal

quotation marks omitted); *see Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, No. 10-CV-

2618, 2011 WL 3471508, at *15 (E.D.N.Y. 2011); *see also West v. Goodyear Tire & Rubber

Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (district court may impose sanctions for spoliation as part

of inherent power to control litigation);  Defendants admit that they had a duty to preserve the

August 17, 2009 video and challenge only whether they possessed the requisite culpability and

the relevance of the video.  (Ds' Cross-Motion Opp'n Mem. 3.)[17]

1.    Culpability

As to culpability, the Second Circuit has stated that a "case-by-case approach to the

failure to produce relevant evidence" is appropriate because "[s]uch failures occur along a

continuum of fault – ranging from innocence through the degrees of negligence to

---

[17]    "Ds' Cross-Motion Opp'n Mem." refers to Defendant's Memorandum of Law in Opposition to Plaintiff's
Cross-Motion for Summary Judgment and Sanctions.  (Doc. 22.)

intentionality." *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (internal quotation marks omitted).  Because "the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss," *Residential Funding*, 306 F.3d at 108 (internal quotation marks omitted), "discovery sanctions, including an adverse inference instruction, may be imposed upon a party that has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence," *id.* at 113. Accordingly, "[a] culpable state of mind includes the knowing or negligent failure to produce evidence." *PSG Poker, LLC v. DeRosa-Grund*, No. 06-CV-1104, 2007 WL 1837135, at *5 (S.D.N.Y. June 27, 2007).

Defendants admit that their failure to preserve the video was negligent, (*see* Ds' Cross-Motion Opp'n Mem. 3), and thus they possessed a sufficiently culpable state of mind to support the imposition of sanctions.  But accepting all of Marasse's factual statements, I find Defendants to have been at least grossly negligent in the destruction of the video.[18]  First, Marasse took no steps to put on hold the Town Court's normal process for the destruction of video recordings once he received either Plaintiff's or Plaintiff's counsel's notice of claim, either of which should have reasonably led Marasse to anticipate litigation. *See Chan v. Triple 8 Palace, Inc.*, No. 03-CV-6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) ("[U]tter failure to establish any form of litigation hold at the outset of litigation is grossly negligent."); *see also Yu Chen v. LW Rest., Inc.*, No. 10-CV-200, 2011 WL 3420433, at *9 (E.D.N.Y. Aug. 3, 2011) ("once a party reasonably anticipates litigation," obligation to preserve arises and "runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.") (internal quotation marks omitted).  Second,

---

[18]     Much of Marasse's affidavit consists of hearsay.  Because I find a culpable state of mind in any event, I need not determine whether or not to disregard the hearsay.

Marasse, Dellacio (who was responsible for making the recording) and an unnamed court administrator – who presumably should have been familiar with how the video surveillance system worked – were all unfamiliar with how the time stamp worked, an essential part of recalling video from a particular incident, as this case illustrates. *See Pastorello v. City of N.Y.,* No. 95-CV-470, 2003 WL 1740606, at *12 (S.D.N.Y April 1, 2003) (defendants' ignorance of their own reporting and record-keeping procedures contributed to a finding of gross negligence). Finally, Marasse received Plaintiff's notice of claim and request for video on October 20, 2009 and Plaintiff's counsel's notice of claim on November 10, 2009, yet apparently did nothing to secure the video. The request was repeated at Plaintiff's 50-h hearing on January 28, 2010 and in a formal document demand under Federal Rule of Civil Procedure 34, propounded by Plaintiff on November 5, 2010. (Weingarden Aff. Ex. 6.) Marasse states that he requested a DVD of the video after the 50-h examination, but for reasons unexplained, Plaintiff did not receive the recordings until March 25, 2011, seventeen months after the original request and fourteen months after the 50-h examination. Spoliation could have been avoided had Marasse diligently requested the recording earlier and reviewed it (or allowed Plaintiff to inspect it) to ensure that it was of the correct period on August 17, 2009. These failures, combined with the fact that video from the correct period was destroyed by the time the error was realized, could plausibly suggest something more than gross negligence, although I decline to so find.

## 2.   Relevance

To establish the relevance of spoliated evidence, a party seeking sanctions must demonstrate that the evidence was more than merely probative under Rule 401 of the Federal Rules of Evidence. *See Matteo v. Kohl's Dep't Stores, Inc.,* No. 09-CV-7830, 2012 WL 760317, at *5 (S.D.N.Y. Mar. 6, 2012); *Wade v. Tiffin Motorhomes, Inc.,* 686 F. Supp. 2d 174, 195 (N.D.N.Y. 2009). But "[t]he burden placed on the moving party to show that the lost evidence

would have been favorable to it ought not to be too onerous, lest the spoliator be permitted to profit from its destruction." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 123 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Residential Funding*, 306 F.3d at 109 (too strict a standard of proof regarding likely contents of destroyed evidence would subvert purpose of adverse inference and allow spoliator to profit from destruction). For modest sanctions – such as costs and fees – the moving party need only show that the evidence was "pertinent to its claims" to establish relevance. *Matteo*, 2012 WL 760317, at *5; *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010) (less severe sanctions such as fines and cost shifting focus on the spoliator's conduct). For more severe sanctions – such as dismissal, preclusion, or the imposition of an adverse inference – the moving party must show that a reasonable jury could find that the destroyed evidence would have been favorable to its case. *See Pension Comm.*, 685 F. Supp. 2d at 467-68 & n.33.[19] In certain cases where the spoliator acts with at least gross negligence, however, relevance as required for sanctions (modest or severe) may be presumed. *See id.* at 467 & n.32; *Matteo*, 2012 WL 760317, at *5 (in cases of gross negligence "'that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor)'") (quoting *Residential Funding*, 306 F.3d at 109).

Here I find that the grossly negligent conduct in allowing the video to be destroyed "rise[s] to the egregious level . . . where relevance is determined as a matter of law." *Treppel*, 249 F.R.D. at 122. As discussed above, in addition to Marasse's failure to implement a litigation

---

[19] There is disagreement as to whether an adverse inference instruction is a severe or modest sanction. *See De Espana v. Am. Bureau of Shipping*, No. 03-CV-3573, 2007 WL 1686327, at *2 (S.D.N.Y. June 6, 2007) (modest sanction); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) (noting both views). Such a determination is likely case-dependent, but I do not find the distinction relevant to Plaintiff's motion.

hold, the inexcusably lengthy period between the requests for and provision of the video, and the collective ignorance of people who should have known how the time stamp on the surveillance system worked, the delay was just long enough to prevent the production of a recording of the correct time period after the time stamp error was discovered. Had Marasse acted diligently upon either notice of the claim or upon Plaintiffs' counsel's requests, there would have been time to retrieve and produce the relevant footage. Marasse did not overlook a single obligation, but rather disregarded multiple notices and multiple requests, and apparently delayed for over a year beyond the time he acknowledges he himself requested the video. No excuses for this egregious conduct have been provided. In any event, I find that a jury could find that the video recording would have been favorable to Plaintiff's case and thus relevant for the purposes of Plaintiff's motion, as it at least might have showed him being denied access to the Town Court with his food, a fact that, as discussed below, would assist Plaintiff in establishing that he was denied a reasonable accommodation in violation of Title II of the ADA.

Accordingly, Plaintiff's motion for sanctions is granted. I now turn to which sanctions are appropriate.

### 3.   Choice of Sanctions

A district court has broad discretion in crafting an appropriate sanction, but it should be designed to "(1) deter parties from engaging in spoliation, (2) place the risk of an erroneous judgment on the party who wrongfully created the risk, and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West*, 167 F.3d at 779 (internal quotation marks omitted).

First, Plaintiff seeks a most extreme sanction, default judgment on all claims, a request that is measured under the same standards as one for dismissal of a case as a sanction upon a plaintiff. *See Chan*, 2005 WL 1925579, at *9. Default judgment is warranted where a plaintiff

-14-

can show willfulness, bad faith, or fault (gross negligence), *see id.*, but it is a "drastic[] remedy [that] should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West*, 167 F.3d at 779 (internal quotation marks omitted) (reversing dismissal because less drastic sanctions were adequate). Even though Defendants acted with gross negligence, I decline to grant Plaintiff default judgment, as I find that other alternative sanctions are adequate to satisfy the three purposes of sanctions mentioned above. Other sanctions discussed below will deter Defendants and other parties from engaging in spoliation and place the risk of an erroneous judgment on Defendants, who wrongfully created the risk of spoliation. And the loss of the video does not prejudice Plaintiff so greatly as to warrant default judgment, as Plaintiff can present his testimony and that of the Town Court employees – which at this stage appear to establish all material facts the video would have shown – in support of his claims. *See Chan*, 2005 WL 1925579, at *9 (plaintiff's ability to secure other evidence a factor in declining to impose default judgment). Thus, other less drastic sanctions will place Plaintiff close to the position in which he would have been had the video not been destroyed.

I also decline to grant Plaintiff's request for "preclusion of all evidence which might have appeared on the video." (P's Mem. 34.) I am not aware of any cases that discuss this remedy as a sanction, but to the extent that Plaintiff is requesting the exclusion of evidence offered in rebuttal of what the video might have shown, I decline that request. "As long as [Plaintiff] can be protected from undue prejudice, [Defendants] should not be disabled from presenting contrary, truthful evidence." *Chan*, 2005 WL 1925579, at *9.

An adverse inference instruction, however, is appropriate here. It will deter Defendants and their attorneys from engaging in or allowing spoliation of evidence, and it places the risk of

-15-

an erroneous judgment on Defendants, who are responsible for the spoliation. It will also restore Plaintiff to the position he would have been in absent the destruction of the video, as presumably he would have introduced it as evidence to support at least some of his claims. I also find it appropriate to award Plaintiff related costs and attorneys' fees to deter future spoliation and to make Plaintiff financially whole. Costs and fees will be limited, however, to expenses related to "the discovery necessary to identify alternative sources of information or from the investigation and litigation of the . . . destruction itself." *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 78 (S.D.N.Y. 1991) (internal citations omitted). These include resources spent in making the motion for sanctions and any discovery stemming from the destruction of the video, but do not include resources spent in connection with the original effort to obtain the video, as Plaintiff would have expended those resources regardless of Defendants' spoliation. Plaintiff's counsel is directed to make a separate application to the Court with respect to costs and fees regarding spoliation within 14 days of the date of this Order, and Defendants may respond within 14 days of Plaintiff's submission.

## III.   **Defendants' Motion for Summary Judgment**

### A.   **Legal Standards**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"In borderline cases, an inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (internal quotation marks omitted). But "the destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence – or utterly inadequate evidence – in support of a given claim to survive summary judgment on that claim." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998).[20]

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). Where, as here, an affidavit is used to support or oppose the motion, it "must be made on personal

---

[20]     None of Plaintiff's claims dismissed below are of the borderline variety.  Thus, the adverse inference does not save otherwise meritless claims from summary judgment in Defendants' favor.

knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

### B.    Plaintiff's Disability Discrimination Claims

Title II of the ADA, entitled "Public Services," provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[21] To make out a Title II claim, Plaintiff must show "'(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability.'" *Goonewardena v. New York*, 05-CV-8554, 2008 WL 4090467, at *8 (S.D.N.Y. Aug. 26, 2008) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)).[22] The same legal standards govern Rehabilitation Act Section 504 claims, *see* 29 U.S.C. § 794(a); *Hargrave*, 340 F.3d at 35, and NYHRL § 296 disability discrimination claims, *see Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004); *Stephens v. Shuttle Assocs., L.C.C.*,

---

[21]    "Public entity" is defined, among other things, as any "State or local government," as well as "any department, agency, . . . or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

[22]    A "qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

547 F. Supp. 2d 269, 278-79 (S.D.N.Y. 2008),[23] and thus I treat Plaintiff's disability discrimination claims together unless otherwise noted.

As a preliminary matter, neither Title II of the ADA nor Section 504 of the Rehabilitation Act permit suits against officials in their individual capacities. *See Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Goonewardena v. New York*, 475 F. Supp. 2d 310, 321 (S.D.N.Y. 2007). Further, claims against officials in their official capacities are properly dismissed as duplicative of claims against the public entity itself, if named as a defendant, *see Denmeade v. King*, No. 00-CV-407, 2002 WL 31018148, at *3 (W.D.N.Y. Aug. 1, 2002); *Hallett v. N.Y.S. Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 199-200 (S.D.N.Y. 2000); *Candelaria v. Cunningham*, No. 98-CV-6273, 2000 WL 798636, at *2-3 (S.D.N.Y. June 20, 2000), as the Town is here, *cf. Cole v. Goord*, 05-CV-2902, 2009 WL 2601369, at *5 (S.D.N.Y. Aug. 25, 2009) (Title II claims against officials in their official capacity not dismissed when public entity not named). Plaintiff's state-law disability discrimination claim, however, could give rise to individual liability. *See* NYHRL § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."); *see also Green v. City of N.Y.*, 465 F.3d 65, 85 (2d Cir. 2006) (NYHRL does not have "public entity" requirement found in Title II of ADA, and thus applies to at least some individuals); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) ("Based on [NYHRL § 296(6)], a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NY]HRL."). Thus,

---

[23]      The NYHRL defines disability more broadly than the ADA. *See Smith v. Pilgrim Power Elec. Contracting LLC*, No. 09-CV-6130, 2011 WL 3962576, at *6 n.3 (S.D.N.Y. Sept. 6, 2011). But this difference is immaterial here because, as discussed below, Plaintiff has a disability under the ADA definition.

Defendants' motion for summary judgment is granted as to Plaintiff's Title II and Section 504 claims against the Individual Defendants.

      1.    <u>Qualified Individual with a Disability</u>

      Defendants first argue that Plaintiff does not have a "disability" within the meaning of the ADA, (Ds' Mem. 4-7), which is, in relevant part, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A); *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 n.7 (2d Cir. 2003) (definition of disability applies to all titles of the ADA). To establish a disability, plaintiff must (1) "show that [he] suffers from a physical or mental impairment," (2) "identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,'" and (3) "show that [his] impairment 'substantially limits' the major life activity previously identified." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 147 (2d Cir. 2002); *see Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Brandon v. O'Mara*, No. 10-CV-5174, 2011 WL 4478492, at *5 (S.D.N.Y. Sept. 28, 2011). Defendants contend only that Plaintiff is not "substantially limited" in major life activities, (*see* Ds' Mem. 6; Ds' Reply Mem. 9[24]), which include eating as well as the functioning of digestive and bowel systems, *see* 42 U.S.C. § 12102(2).[25]

---

[24]    "Ds' Reply Mem." refers to Defendants' Memorandum of Law in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment. (Doc. 21.)

[25]    Defendants initially disputed whether Plaintiff's condition limited a "major life activity," (*see* Ds' Mem. 4-5), without acknowledging the ADA Amendments Act of 2008 ("ADAAA"), which amended the ADA and by express inclusion, the Rehabilitation Act, to expand the previous definition of "major life activities." *See* Pub. L. No. 110-325, § 4(a), 122 Stat. 3553, (2008); *Shah v. Eclipsys Corp.*, No. 08-CV-2528, 2010 WL 2710618, at *6 & n.5 (E.D.N.Y. July 7, 2010). Post-ADAAA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see* 29 C.F.R. § 1630.2(i). Major life activities also encompass "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B); *see* 29 C.F.R. § 1630.2(i). Defendants relied on *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2d Cir. 1998), (*see* Ds' Mem. 4-5), a pre-ADAAA case which cited a non-exclusive list of major life activities that did not include eating or the list of major bodily functions and which assumed, without deciding, that "elimination of bodily waste" was a major life activity, *id.* at 871. Post-ADAAA, it

In enacting the ADA, Congress intended to provide "broad coverage" for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), as "interpret[ing] the term 'substantially limits' to require a greater degree of limitation than was intended." Pub. L. No. 110-325 § 2(a)(1), (7); *see* 29 C.F.R. § 1630.2(j)(1)(iv); *cf. Toyota*, 534 U.S. at 198 ("[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."). The ADA does not define the term "substantially limited," but post-ADAAA regulations state that this standard "is not meant to be a demanding [one]," 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," *id.* § 1630.2(j)(1)(iii); *see Brtalik v. S. Huntington Union Free Sch. Dist.*, No. 10-CV-0010, 2012 WL 748748, at *4 (E.D.N.Y. Mar. 8, 2012).

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii); *see Brandon*, 2011 WL 4478492, at *7. This inquiry "usually will not require scientific, medical, or statistical analysis," although such evidence is of course not prohibited, *id.* § 1630.2(j)(1)(v), and is made "without regard to the ameliorative effects of mitigating measures," *id.* § 1630.2(j)(1)(vi); *see* 42 U.S.C. 12102(4)(E); *see also* Pub. L. No. 110-325 § 2(b)(2) (ADAAA rejects holding of *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), which required analysis of ameliorative effects of mitigating measures).

---

is clear that Plaintiff's condition impairs at least the major life activities that encompass the elimination of bodily waste – that is, eating and digestive and bowel functions. In any event, Defendants seem to have disclaimed the argument that Plaintiff's impairment does not limit a major life activity. (*See* Ds' Reply Mem. 9.)

Under post-ADAAA standards, Plaintiff has created questions of material fact for a jury to decide. Crediting Plaintiff's evidence as true and giving him all reasonable inferences, a jury could easily find, based on his description of his impairment, that he is substantially limited compared to most people in the general population at least in his ability to eat and the functioning of his digestive and bowel systems. Defendants rely on portions of Plaintiff's testimony that he is able to work, works from home unless he is needed in the office, and can plan his meals so that he can be away from home for periods of time without eating, and that his condition is improving. (*See* Ds' Mem. 5-6, Ds' Reply 9; Kravtsov Dep. 7-8, 86, 88,129-30.) But, in Plaintiff's case, planning meals is a mitigating measure the ameliorative effects of which cannot be considered in determining whether his impairment substantially limits major life activities. As to improvements in Plaintiff's condition, temporary impairments can qualify as substantially limiting, *see Brandon*, 2011 WL 4478492, at *7 ("'[T]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting . . . .'") (quoting 29 C.F.R. § 1630.2(j)(1)(ix)), and thus a jury could find that he was disabled on the day in question. In any event, the evidence on which Defendants rely does not establish that Plaintiff is or ever will be functioning on substantially the same level as the general population, and a jury could thus conclude that Plaintiff is still disabled despite improvements in his condition. Accordingly, I deny Defendants' motion for summary judgment on the grounds that Plaintiff was not disabled on the day in question.

2.   Discrimination on the Basis of Disability

Defendants also seek summary judgment on the grounds that Plaintiff was not denied access to the Town's services, programs, or activities, nor was he otherwise discriminated against based on his disability. (Ds' Mem. 7-11.) Plaintiff argues that even though he was allowed into court, he was nevertheless discriminated against under the ADA because he was not

afforded a reasonable accommodation in two ways: (1) he was not allowed to take his food into the courtroom with him, but was only allowed to leave his food with the court officers at the courthouse entrance; and (2) he was not allowed to eat on the courthouse grounds. (*See* Am. Compl. 8; P's Mem. 23-27.) Thus, although Plaintiff's briefing is not clear, he appears to concede that he was not excluded from the Town's services, programs, or activities, but rather proceeds on a reasonable accommodation discrimination theory.[26]

"Title[] II . . . of the ADA prohibit[s] discrimination against qualified disabled individuals by requiring that they receive reasonable accommodations that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004) (internal quotation marks omitted). The ADA requires such reasonable accommodations be made "available to a qualified person with a disability unless the provider of the service can demonstrate that the accommodation would impose an undue hardship on its operations." *Id.* (alterations and internal quotation marks omitted); *see Meekins v. City of N.Y.*, 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007) (looking to regulation implementing Section 504, Title II requires covered entity to "'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program'") (quoting 28 C.F.R. § 41.53 (2008)); *see also Henrietta D.*, 331 F.3d at 273 & n.7 (definition of discrimination in ADA includes failure to accommodate). The reasonable accommodation requirement is meant to put people with disabilities "on an even playing field with the non-disabled," but "it does not

---

[26]    "A qualified individual can base a [disability] discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks omitted). Plaintiff makes no mention of intentional discrimination or disparate impact based on his disability.

authorize a preference for disabled people generally." *Felix v. N.Y.C. Transit Auth.*, 324 F.3d

102, 107 (2d Cir. 2003).  Further, the ADA "cannot regulate individuals' conduct so as to ensure

that they will never be rude or insensitive to persons with disabilities," *Camarillo v. Carrols*

*Corp.*, 518 F.3d 153, 157 (2d Cir. 2008) (internal quotation marks omitted), nor does it

"contemplate perfect service" for those with disabilities, *Stephens*, 547 F. Supp. 2d at 278.

      Undue hardship under the ADA is defined as "one requiring significant difficulties or

expense when considered in light of a number of factors," *Powell*, 364 F.3d at 88, which are:

> (i) the nature and cost of the accommodation needed . . .;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B).

      I find that there are genuine issues of material fact as to both of Plaintiff's reasonable

accommodation claims.  A jury, balancing the undue hardship factors, could conclude that it

would have been reasonable to allow Plaintiff to eat outside on the courthouse grounds, despite

Pinn's reason (security) for not allowing him to do so.  Likewise, a jury could find that it would

have been reasonable to allow Plaintiff to bring his food with him into the courtroom.  On the

other hand, it could find that, as Pinn's testimony suggests, Plaintiff could have obtained

authorization to bring his food into the courtroom with him, and just did not avail himself of that

option.[27]  The record, however, does not overwhelmingly favor Defendants as to the reasonable

accommodation and undue hardship inquiries.  Accordingly, Defendants' motion for summary

judgment is denied as to Plaintiff's remaining disability discrimination claims – that is, his Title

II and Section 504 claims against the Town as well as his NYHRL § 296 claims against all

Defendants.

### C.   Plaintiff's Claims of Discrimination Based on Race/National Origin and Religion

The Amended Complaint alleges three discrimination causes of action based on race,

national origin, or religion:  1) a violation of Section 1981 due to religious and racial bias, 2)

violations of Title VI, and 3) violations of NYHRL § 296 on the basis of religion and national

origin.  (Am. Compl. 10-12, 13-14.)  Defendants argue that Plaintiff was not discriminated

against on these bases.  (*See* Ds' Mem. 11-12).  Plaintiff, whose argument consists of one

paragraph with no citation to any law or even reference to the statutes under which he claims a

cause of action, states, "Discriminatory Animus In General Is Apparent In All Of The

Circumstances Of This Action."  (P's Mem. 27.)[28]  I will address Plaintiff's Title VI and Section

1981 claims first, and then his state-law claims.

### 1.   Title VI and Section 1981 Claims

Title VI provides that "[n]o person in the United States shall, on the ground of race,

color, or national origin, be excluded from participation in, be denied the benefits of, or be

---

[27]    Defendants have not set forth the reasons for the rule prohibiting food in the courthouse, although some obvious ones spring to mind.  If such reasons were presented at trial, a jury could find that waiving the rule to accommodate Plaintiff would not be an undue hardship.

[28]    This argument appears to be a second paragraph heading, but no paragraph text follows it.  This argument is of no use to the Court, and Plaintiff's counsel is advised, should he submit briefing to this Court in the future, to cite law and facts, and explain how the law applies to the facts.

subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d.   Likewise, Section 1981 provides that

> [a]ll persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties,
> give evidence, and to the full and equal benefit of all laws and proceedings for
> the security of persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a).[29]   To make out a claim under either Title VI or Section 1981, Plaintiff must

demonstrate:  (1) Defendant discriminated against Plaintiff on the basis of race,[30] or, in the case

of Title VI, national origin; (2) the discrimination was intentional, and (3) the discrimination was

a substantial and motivating factor for Defendants' actions. *See Tolbert v. Queens Coll.*, 242

F.3d 58, 69 (2d Cir. 2001); *Simpson ex rel. Simpson v. Uniondale Union Free Sch. Dist.*, 702 F.

Supp. 2d 122, 133 (E.D.N.Y. 2010); *see also Alexander v. Sandoval*, 532 U.S. 275, 281 (2001)

("Title VI itself directly reaches only instances of intentional discrimination.") (alteration and

internal quotation marks omitted); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S.

375, 391 (1982) ("We conclude . . . that § 1981 . . . can be violated only by purposeful

discrimination.").

Here, Plaintiff admitted at his deposition that his not being allowed to bring food into the

courtroom was unrelated to his being Jewish. (*See* Kravtsov Dep. 45.)  Putting that aside, the

record is devoid of evidence of intentional race or national origin discrimination as a factor in

---

[29]    Title VI claims cannot be brought against the Individual Defendants in their individual capacities because they are not recipients of federal funding. *See Goonewardena*, 475 F. Supp. 2d at 328; *Rodriguez v. N.Y. Univ.*, No. 05-CV-7374, 2007 WL 117775, at *6 (S.D.N.Y. Jan.16, 2007). Moreover, "[a] claim against a government officer in [his or her] official capacity is, and should be treated as, a claim against the entity that employs the officer," *Mathie v. Fries*, 121 F.3d 808, 818 (2d. Cir. 1997), and thus the Title VI claims against the Individual Defendants are dismissed, *see Hickey v. Myers*, No. 09-CV-1307, 2012 WL 431592, at *7 (N.D.N.Y. Feb. 10, 2012). Accordingly, I consider only Plaintiff's Title VI claim against the Town. Section 1981 allows claims against individuals in their individual capacity so long as the individual was personally involved in the discriminatory action. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).

[30]    By "race," Plaintiff apparently intends to refer to the fact that he is Jewish, not the fact that he is Caucasian. Section 1981 extends to "to Jews understood as a 'race.'" *United States v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002).

Defendants' actions, let alone a substantial and motivating factor.  Plaintiff claims that "his description of the events, coupled with the court officer's less than credible protestations, could lead a reasonable jury to find that there was some . . . racial animus involved in the defendants' actions."  (P's Mem. 27.)  But Plaintiff's claim of racially discriminatory treatment by the court officer when passing through the courthouse metal detector for the first time is based only on his own conclusory and wholly subjective assertions, (*see* P's Mem. 27; *see, e.g.*, Kravtsov Decl. ¶ 32 ("Although he did not make anti-Semitic remarks, it appeared by his comments and demeanor that my accent and kippah played a part in his bad treatment of me.")), which are not enough to survive summary judgment, *see Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[I]n the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."); *Hirschberg v. Bank of Am., N.A.*, 754 F. Supp. 2d 500, 520 (E.D.N.Y. 2010) (plaintiff's subjective belief that she was discriminated against was insufficient to survive summary judgment); *Drayton v. Toys "R" Us Inc.*, 645 F. Supp. 2d 149, 161 (S.D.N.Y. 2009) (conclusory allegations of discrimination and plaintiff's assumption that defendants perceived plaintiff's appearance insufficient as a matter of law to give rise to inference of discrimination); *Tripp v. Long Island Univ.*, 48 F. Supp. 2d 220, 225 (E.D.N.Y. 1999) ("A plaintiff cannot defeat a summary judgment motion by 'the mere incantation of [discriminatory] intent or state of mind.'") (alteration in original) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)), and which I disregard in any event because they conflict with his testimony earlier in the case.  Moreover, there is no evidence that Plaintiff was treated differently than people of other races or national origins.  *See Albert v. Carovano*, 851 F.2d 561, 573 (2d Cir. 1988) (selective enforcement claim under Section 1981 requires evidence of "purposeful and systematic discrimination by specifying instances in which they were singled

out for unlawful oppression in contrast to others similarly situated") (alteration, emphasis, and internal quotation marks omitted). Plaintiff, at best, has evidence only of rude or insensitive treatment; he simply has no evidence of discrimination on the basis of race or national origin. Thus, even though I found an adverse inference instruction to be appropriate as to Plaintiff's claim of disability discrimination, Defendants' motion for summary judgment as to Plaintiff's Title VI and Section 1981 claims is granted.

        2.    <u>NYHRL Section 296 Racial and Religious Discrimination Claims</u>

Defendants' only argument regarding Plaintiff's claims of racial and religious discrimination in violation of NYHRL § 296 is that Plaintiff "admits that his religion 'had nothing to do with [being allowed or not allowed into the courtroom],'" and thus Plaintiff "was not discriminated against on the basis of religion or his national origin." (Ds' Mem. 11 (alteration in original) (quoting Kravtsov Dep. 45).) In response, Plaintiff makes no argument specific to his state-law claims, but cites the same evidence and makes the same argument as he did in support of his Title VI and Section 1981 claims: that a reasonable jury could find that there was some animus – religious and racial under NYHRL § 296 as opposed to racial and national origin-based under Title VI and Section 1981 – in Defendants' actions. (*See* P's Mem. 27.) Defendants are entitled to summary judgment for the same reasons as they were regarding Plaintiff's Title VI and Section 1981 claims, there being no evidence of intentional discrimination on any of the cited bases. Moreover, Plaintiff's admission that his religion had nothing to do with him not being allowed into the courtroom wholly undercuts his state-law claim of religious discrimination.

Thus, Defendants' motion for summary judgment is granted as to Plaintiff's NYHRL § 296 religious and racial/national origin discrimination claims.

### D.   Plaintiff's Section 1983 Claims

Section 1983 is a statutory vehicle for bringing claims premised on violations of constitutional rights committed under color of state law. *See Frenkel v. N.Y.C. Off-Track Betting Corp.*, 701 F. Supp. 2d 544, 551 (S.D.N.Y. 2010). The second cause of action in Plaintiff's Amended Complaint lists four such violations of constitutional rights:  the right to free access to the courts[31] and the Fourteenth Amendment rights to procedural due process, substantive due process, and equal protection. (*See* Am. Compl. 9.) Although Plaintiff, who is represented by counsel, pleads that this list is not exclusive, he does not identify any other constitutional violations in the Amended Complaint or his briefing. Thus, I will limit his list of alleged constitutional violations to the four specified above.

Exactly which of Plaintiff's claims Defendants challenge, however, is far from clear. Defendants' only challenge to Plaintiff's second cause of action appears on page ten of their opposition, as indicated by the inclusion of the second cause of action in the heading on that page. This heading reads, "Plaintiff Was Not Discriminated Against." Defendants then appear to argue that there was no violation of Plaintiff's rights under the Fourteenth Amendment, the ADA, Title VI, Section 1981, or NYHRL § 296. (*See* Ds' Mem. 11.) Defendants make no mention of the constitutional rights specifically listed in the Amended Complaint, nor do they raise any arguments as to these rights in their reply brief. While Defendants may nominally challenge Plaintiff's procedural and substantive due process claims by citing the Fourteenth Amendment, I interpret Defendants to be challenging only Plaintiff's claimed violation of the

---

[31]     Courts have grounded this right variously in the Privileges and Immunities Clause of Article IV of the Constitution, the First Amendment's right to petition government for redress of grievances, the Due Process Clauses of the Fifth and Fourteenth Amendments, the Sixth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. *See Doe v. C.I.A.*, 576 F.3d 95, 105 n.7 (2d Cir. 2009); *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004).

Equal Protection Clause of the Fourteenth Amendment, given that Defendants argue only discrimination.

To succeed on his equal protection claim, as with his Title VI and Section 1981 claims, Plaintiff must prove "purposeful or intentional discrimination." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004); *see Alexander*, 532 U.S. at 280-81 (Title VI); *Tolbert*, 242 F.3d at 69 (Section 1981). The parties are not clear as to the factual basis for Plaintiff's equal protection claim, but from Plaintiff's other discrimination claims, I assume that he is claiming discrimination on the basis of religion, race, national origin, and disability.

Plaintiff's equal protection claim fails on all four bases. As to religious, racial, and national-origin discrimination, Plaintiff's claims fail for the same reasons as his Title VI, Section 1981 and, NYHRL § 296 discrimination claims, having cited no evidence of intentional discrimination. Likewise, Plaintiff cites no evidence of intentional discrimination on the basis of disability. For example, he does not suggest that non-disabled people were permitted to bring food into the courthouse.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's equal protection claim is granted.[32]

### E.      Plaintiff's Excessive Force and Assault and Battery Claims

Plaintiff, in his assault and battery cause of action, pleads violations of his rights secured by the Constitution and laws of the United States and the State of New York, (Am. Compl. 14),

---

[32]      It appears to the Court that one or more of the other constitutional claims asserted via Section 1983 might be susceptible to summary disposition. One week before the next conference in this case, Plaintiff is to advise the Court by letter (not to exceed three pages) as to the theories underlying his right of access, procedural due process, and substantive due process claims. (For example, for his procedural due process claims he should identify the liberty or property interest of which he was deprived and the process he believes he was due; and for his right-of-access claim, he should explain how he has a "(1) a nonfrivolous, arguable underlying claim that has been frustrated by the defendants' actions, and (2) a continued inability to obtain the relief sought by the underlying claim." *Arar v. Ashcroft*, 585 F.3d 559, 592 (2d Cir. 2009) (internal quotation marks omitted).) The parties should be prepared to discuss at the conference whether genuine issues of material fact exist as to these claims.

and thus I assume this cause of action consists of a claim for excessive force in violation of the Fourth Amendment, made actionable by Section 1983, as well as state-law assault and battery claims. Plaintiff does not specify the factual basis for these claims in the Amended Complaint, but appears to argue that he was assaulted when Pinn ordered him to the courthouse as he was attempting to eat his food outside the courthouse. (*See* P's Mem. 14.) Defendant moves for summary judgment on these claims on the grounds that the court officer who confronted Plaintiff did not use physical force. (*See* Ds' Mem. 13.) Plaintiff concedes that the record does not support a claim of battery, (*see* P's Mem. 14) – and thus also does not support a claim of excessive force, as both causes of action require an actual use of force, *see United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d. Cir. 1993) ("A 'battery' is an intentional wrongful physical contact with another person without consent."); *Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *4 (S.D.N.Y. Mar. 26, 2012) (Section 1983 excessive force claim requires objectively unreasonable use of force); *Prince v. Cablevision Sys. Corp.*, No. 04-CV-8151, 2005 WL 1060373, *13 (S.D.N.Y. May 6, 2005) ("touching of a person constitutes a battery if done without consent and in a rude, violent, and angry or insolent manner") (internal quotation marks omitted) – but instead contends that the court officer's actions constituted an assault, (*see* P's Mem. 14).[33] Thus, I consider Plaintiff's assault claim only.

Assault is an "intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat'l Ins.*, 994 F.2d at 108. To make out an assault claim, Plaintiff must show that another person made an "intentional attempt, displayed by violence or threatening gesture, to do injury to, or commit a battery upon" him. *Prince*, 2005 WL 1060373,

---

[33]     Even if, as Plaintiff testified, the court officer touched Plaintiff's upper arm in the same manner as a police officer directing someone in a subway, so as to "slightly push" the person in the correct direction, (Kravtsov Dep. 100:7-17), Plaintiff's battery and excessive force claims would fail because this touching as Plaintiff described it was not made in a rude, violent, angry, insolent, or otherwise unreasonable manner.

at *13.  Harsh words or verbal threats, standing alone, do not constitute assault.  *See Silver v. Kuehbeck*, No. 05-CV-35, 2005 WL 2990642, at *13 (S.D.N.Y. Nov. 7, 2005) ("[T]hreats, standing alone, do not constitute an assault.") (alteration in original) (internal quotation marks omitted); *Castro v. Local 1199*, 964 F. Supp. 719, 732 (S.D.N.Y. 1997) ("With respect to verbal threats, words not accompanied by circumstances inducing a reasonable apprehension of bodily harm, such as movements of drawing back a fist, aiming a blow, or the show of a weapon, do not constitute an assault.") (internal quotation marks omitted); *Williams v. Port Auth. of N.Y & N.J.*, 880 F. Supp. 980, 994 (E.D.N.Y. 1995) (no assault where "there was no evidence presented at trial to suggest that [defendant] raised his fist or did anything, in conjunction with any harsh words, to suggest imminent bodily contact").

Plaintiff argues that "he was put in fear of imminent harmful or offensive contact when he was approached by the court officer, forbidden to sit and take his nourishment, and insistently ordered back to the courthouse." (P's Mem. 14.) But Plaintiff's argument fails on its face, as it does not suggest that the Pinn did anything more than use harsh words (if even that) in the encounter outside the courthouse.  Moreover, as Defendant correctly notes, the record contains no evidence that Pinn made any threatening or violent gestures towards Plaintiff during the encounter. (*See, e.g.*, Kravtsov Aff. ¶¶ 38-50.)  Thus, no reasonable jury could find that the court officer assaulted Plaintiff.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's assault and battery claim is granted.

**F.     Plaintiff's False Imprisonment Claim**

Plaintiff also does not specify the factual basis of his false imprisonment claim[34] in the Amended Complaint, (*see* Am. Compl. 15), but appears to contend in his Memorandum in Opposition to Defendant's motion for summary judgment that he was falsely imprisoned when he left the courthouse to take his food and was subsequently ordered by Pinn to walk back to the courthouse. (*See* P's Mem. 13-14.) Defendant moves for summary judgment on Plaintiff's false imprisonment claim on the grounds that Plaintiff was not confined by Pinn during that encounter. (*See* Ds' Mem. 12-13.)

The elements of false imprisonment are: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (alteration in original) (internal quotation marks omitted); *see EC ex rel. RC v. Cnty. of Suffolk*, No. 08-CV-3227, 2012 WL 1078330, at *21 (E.D.N.Y. Mar. 30, 2012) (intent to confine demonstrated by defendants holding plaintiff and his arms down). In addition, a "false imprisonment claim requires a prima facie showing of actual confinement or threatening conduct." *Lee v. Bankers Trust Co.*, No. 96-CV-8153, 1998 WL 107119, at *4 (S.D.N.Y. Mar. 11, 1998); *see Samirah v. Sabhnani*, 772 F. Supp. 2d 437, 451 (E.D.N.Y. 2011) (defendants confined plaintiff to a work area through use of "threats of serious harm or physical restraint"); *cf. Cellamare v. Milbank, Tweed, Hadley & McCloy LLP*, No. 03-CV-39, 2003 WL 22937683, at *8 (E.D.N.Y. Dec. 2, 2003) (no false imprisonment where plaintiff not forced to stay at interview and not told she was not free to leave).

---

[34]     Plaintiff pleads violations of his right to be free from false imprisonment under federal and state law. (Am. Compl. 15.) The elements of a federal false imprisonment claim, made actionable by Section 1983, and the state-law tort for false imprisonment are the same for purposes of this motion. *See Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir. 2001); *Bourgeois v. Pelkey*, No. 08-CV-798, 2011 WL 1135927, at *3 (N.D.N.Y. Mar. 25, 2011). Thus I refer to Plaintiff's claims as a single false imprisonment claim.

Here, the record does not support a claim of false imprisonment because by Plaintiff's account he was not confined, either physically or by threatening conduct. While Plaintiff was sitting on the lawn area outside the courthouse, Pinn told him that he could not eat there and that he should pick up his belongings and follow Pinn. (*See* Kravtsov Dep. 78-79.) As they approached the courthouse, Plaintiff asked Pinn where he could eat his food if he could not take it in the courtroom, and Pinn told Plaintiff, although perhaps in a rude manner, that he could leave or sit on the steps to eat. (*Id.* at 79-82.) Even though Plaintiff may have felt like he had no choice but to go with the court officer back to the courthouse, (Kravtsov Aff. ¶ 42), a "subjective feeling of being trapped is insufficient to prove" that Pinn intended to confine Plaintiff. *Golodner v. Quessant Inc.*, No. 05-CV-7895, 2007 WL 2844944, at *6 (S.D.N.Y. Sept. 27, 2007). The totality of the circumstances makes clear that Pinn's intent was to prevent Plaintiff from lingering behind the courthouse. As no reasonable jury could find that Pinn intended to confine Plaintiff, Defendants' motion for summary judgment as to Plaintiff's false imprisonment claim is granted.

## G.   Municipal Liability

As discussed above, Plaintiff's disability discrimination claims against the Town, as well as some of Plaintiff's Section 1983 claims (Defendants did not challenge Plaintiff's claimed violations of his rights to procedural due process, substantive due process, and access to the courts), survive Defendants' motion for summary judgment.[35] In Plaintiff's ninth cause of action titled "Negligence in Policymaking, Hiring, Training and Supervising," regarding an alleged lack of training of Officer Pinn, Plaintiff names all Defendants, (*see* Am. Compl. 15-16), but as

---

[35]   I interpret the Amended Complaint as alleging municipal liability for each of those claims, as they name all Defendants.

discussed below, does not provide any evidence of an individual responsible for such negligence, and thus I treat this cause of action as one against the Town only.

Defendants appear to seek summary judgment as to municipal liability with respect to (1) only Plaintiff's Section 1983 claims alleging violations of Plaintiff's Fourth and Fourteenth Amendment rights to be free from excessive force and false imprisonment and (2) the stand-alone negligence claim. (*See* Ds' Mem 14-15; Ds' Reply 8-9.) As I have dismissed Plaintiff's underlying Section 1983 claims for excessive force and false imprisonment, I address Defendants' second challenge only. *See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *Levy v. Alfano*, 47 F. Supp. 2d 488, 498 (S.D.N.Y. 1999) ("It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official."). In addition, I address Plaintiff's cross-motion – seeking summary judgment on the Section 1983 and negligence claims "insofar as the Defendants' Negligent Training, Hiring and Policymaking" (P's Mem. 36) – simultaneously.

>        1.        Municipal Liability under Section 1983

To successfully bring a Section 1983 claim against a municipality for the actions of a public official, plaintiff must prove the following:  "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008). "Municipalities . . . may not be held liable for the actions of their officers on a theory of *respondeat superior*.  Rather, municipal liability attaches only where the deprivation was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.'" *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 108-09

(2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), and quoting

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)), *overruled in part on other grounds by*

*Appel v. Spiridon*, 531 F.3d 138, 139-40 (2d Cir. 2008). The policy requirement is satisfied by

> existence of (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; [and] (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware . . .

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (internal citations

omitted); *see also Roe*, 542 F.3d at 37 (plaintiff must "demonstrate that, through its deliberate

conduct, the municipality was the 'moving force' behind the alleged injury") (quoting *Bd. of*

*Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)).

Plaintiff appears to base his claim of municipal liability under Section 1983 on a failure-

to-train theory, (*see* P's Mem. 15), under which a "municipality can be liable for failing to train

its employees where it acts with deliberate indifference in disregarding the risk that its

employees will unconstitutionally apply its policies without more training." *Amnesty Am. v.*

*Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citing *City of Canton v. Harris*, 489

U.S. 378, 387-90 (1989)). Municipal liability, however, "is at its most tenuous where a claim

turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *see City of*

*Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion) ("[A] 'policy' of

'inadequate training'" is "far more nebulous, and a good deal further removed from the

constitutional violation, than was the policy in *Monell*"). Thus, for liability to attach, a

municipality's failure to train its employees must amount to "deliberate indifference to the rights

of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S. at 388

*see Brandon*, 705 F. Supp. 2d at 277. Only then "can such a shortcoming be properly thought of

as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389; *see Connick*, 131 S. Ct. at 1359-60.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty.*, 520 U.S. at 410; *see Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) ("deliberate indifference is a stringent standard of fault, and necessarily depends on a careful assessment of the facts at issue in a particular case") (internal citations and quotation marks omitted). Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Bryan Cnty.*, 520 U.S. at 407. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Canton*, 489 U.S. at 392; *see Pembaur*, 475 U.S. at 483 ("[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . ."); *see also Connick*, 131 S. Ct. at 1360 (same).

In our circuit, to demonstrate deliberate indifference, a plaintiff must establish:  (i) that a policymaker knows to a moral certainty that the municipal employees will confront a certain situation; (ii) that that situation presents the municipal employee with either a difficult choice of the type that training or supervision will make less difficult, or that there is a history of municipal employees improperly handling the situation; and (iii) that the wrong choice by the municipal

employee will often cause the deprivation of an individual's constitutional rights. *See Walker v. City of N.Y.*, 974 F.2d 293, 297-98 (2d Cir. 1992). A plaintiff also must ultimately identify "a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361 F.3d at 129 (quoting *Canton*, 489 U.S. at 391). In other words, a plaintiff must demonstrate that the municipal employee's "'shortcomings . . . resulted from . . . a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* at 129-30 (quoting *Canton*, 489 U.S. at 390-91); *see Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440-41 (2d Cir. 2009) ("plaintiff must offer evidence to support the conclusion that the training program was inadequate, not that a particular [state actor] may be unsatisfactorily trained or that an otherwise sound program has occasionally been negligently administered, and that a hypothetically well-trained [state actor] would have avoided the constitutional violation") (alteration and internal quotation marks omitted). "The elements of an identified training deficiency and a close causal relationship, which together require the plaintiff[] to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability." *Amnesty Am.*, 361 F.3d at 130.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1360 (quoting *Bryan Cnty.*, 520 U.S. at 409). Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 407. "Without

-38-

notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 131 S. Ct. at 1360.

In *City of Canton v. Harris*, the Supreme Court left open the possibility that, "in a narrow range of circumstances," a history or pattern of prior violations might not be necessary to show deliberate indifference because the need for more or different training is "obvious." *Bryan Cnty.*, 520 U.S. at 409; *see Connick*, 131 S. Ct. at 1360-61. This hypothesis, however, was premised on the assumption that the municipality had decided not to train its officers about the constitutional limits of the use of deadly force. *Connick*, 131 S. Ct. at 1361. Under such circumstances, the Court opined, the "highly predictable consequence" – in *Canton*, that deadly force could be misused in violation of citizens' rights – could be deemed so obvious as to reflect deliberate indifference. *Id.* (internal quotation marks omitted); *see Harvey v. Campbell Cnty.*, 453 F. App'x 557, 562-63, 566 (6th Cir. 2011) (despite fact that deliberate indifference could be shown "through evidence of a single violation," plaintiff who had been subjected to officer's unreasonable use of deadly force failed to establish deliberate indifference because he had "not produced even a scintilla of affirmative evidence tending to show [defendant's] training was so inadequate as to evidence deliberate indifference"). The obviousness of the risk of constitutional violations from the failure to take action must be "obvious in the abstract," however, and not dependent upon the circumstances of the individuals involved in any particular case. *Gold v. City of Miami*, 151 F.3d 1346, 1352 (11th Cir. 1998) (quoting *Bryan Cnty.*, 520 U.S. at 410); *see Bryan Cnty.*, 520 U.S. at 410-11 (holding isolated incident of sheriff's inadequate screening of deputy's job application did not create such an obvious risk that it alone established municipality's deliberate indifference to risk that deputy would use excessive force); *Btesh v.*

-39-

*City of Maitland*, No. 10-CV-71-19, 2011 WL 3269647, at *32 (M.D. Fla. July 29, 2011)

(finding that "risk of failing to train police officers to flag the addresses of mentally ill persons is

. . . insufficiently obvious in the abstract to impose municipal liability under Section 1983 absent

a prior history of injuries resulting from a failure to flag residences"). Finally, merely showing

"that additional training would have been helpful [to municipal employees] in making difficult

decisions does not establish municipal liability." *Connick*, 131 S. Ct. at 1363; *see Canton*, 489

U.S. at 391 ("[P]rov[ing] that an injury or accident could have been avoided if an [employee] had

had better or more training, sufficient to equip him to avoid the particular injury-causing

conduct" is not sufficient to establish municipal liability); *Harvey*, 453 F. App'x at 563 ("mere

allegations that an officer was improperly trained or that an injury could have been avoided with

better training are insufficient to make out deliberate indifference").

      Here, while the record reflects that Pinn was not trained with regard to the ADA, Plaintiff

points to no evidence suggesting that the Town was on notice that its failure to train would

violate anyone's constitutional rights in any way.[36] There is no evidence of a pattern of similar

incidents committed by Town employees resulting in violations of constitutional rights, and an

incident of this sort – even if it resulted in violations of Plaintiff's constitutional rights in this

case (an open question) – is so singular as to preclude the conclusion that it would so obviously

result in violations of constitutional rights that deliberate indifference can be imputed to the

Town, and thus give rise to municipal liability. Perhaps a jury could find that Pinn should have

been trained to be more responsive to Plaintiff's needs, but absent a track record of constitutional

violations in similar circumstances, his lack of training is insufficient to hold the Town liable for

any possible violations of Plaintiff's constitutional rights. Accordingly, Plaintiff's motion for

---

[36]    Plaintiff's single paragraph of argument – with no citation to law or the record – and statement to "[s]ee facts as law cited above," (P's Mem. 36), is not helpful or persuasive to the Court.

summary judgment is denied, as failure to train is the only basis on which he seeks summary judgment.

### 2.  Negligent Policymaking, Hiring, Training, and Supervising

Defendants do not attack the merits of Plaintiff's negligence claim,[37] but argue that Plaintiff's counsel failed to allege negligence in the notice of claim that he served on the Town. (*See* Ds' Mem. 14-15; *see also* Sandel Decl. Ex. G.)  Plaintiff does not dispute this defect in this notice of claim, but merely states, "In The Event This Court Finds Some Insufficiency In Plaintiff's Notice of Claim, Plaintiff Requests Leave To Correct Or Amend The Notice Of Claim, Or To File A Late Notice Of Claim." (P's Mem. 36.)  But I am without jurisdiction to grant Plaintiff's request.

In federal court, state notice-of-claim statutes govern state-law claims.  *See Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999); *see also Felder v. Casey*, 487 U.S. 131, 151 (1988) ("[F]ederal courts entertaining state-law claims against . . . municipalities are obligated to apply the [state] notice-of-claim provision."); *Tribie v. Parwanta*, No. 10-CV-6016, 2012 WL 246619, at *10 (S.D.N.Y. Jan. 26, 2012) (applying New York notice of claim

---

[37]     Defendants contend, without citing to law, that Plaintiff's claim is not a cause of action within itself, (*see* Ds' Mem. 14), but that statement appears to be inaccurate.  For a claim for negligent hiring, training, supervision or retention, under New York law,

> in addition to the standard elements of negligence, a plaintiff must show:  (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir.2004) (internal citations and quotation marks omitted); *see Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 94 (2d Cir. 2011); *Romano v. SLS Residential, Inc.*, 812 F. Supp. 2d 282, 294-95 (S.D.N.Y. 2011).  "A cause of action for negligent hiring or retention requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Bouchard v. N.Y. Archdiocese*, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) (alteration in original) (internal quotation marks omitted).  The record does not contain any indication that Pinn had a propensity for injuring people like Plaintiff or that the Town knew of any such propensity, so this claim seemingly would fail on the merits in any event.

law to claim of negligent hiring, training, and supervision).  "Under New York law, a notice of

claim is a mandatory precondition to bringing a tort claim against a municipality or any of its

officers, agents or employees."  *Hyde v. Arresting Officer Caputo*, 2001 WL 521699, at *4

(E.D.N.Y. May 11, 2001) (citing N.Y. Gen. Mun. Law §§ 50-e, 50-i(1)(a)); *see also DeCarolis v.

Town of Vienna*, 322 F. App'x 25, 26 (2d Cir. 2009) (summary order) (N.Y. Town Law § 67

requires that notice of claim against a town be served in compliance with N.Y. Gen. Mun. Law §

50-e).  Plaintiff's notice of claim makes no mention of negligence, much less negligent

policymaking, hiring, training, or supervision, and this Court does not have the jurisdiction to

consider Plaintiff's request for leave to amend or file a late notice.  *See Berry v. Vill. of

Millbrook*, 815 F. Supp. 2d 711, 725 (S.D.N.Y. 2011) (collecting cases).[38]  Thus, Defendants'

motion for summary judgment is granted and Plaintiff's motion for leave to file a late notice of

claim is denied as to Plaintiff's ninth cause of action.  *See Bryant v. City of N.Y.*, 590 N.Y.S.2d

913, 914 (2d Dep't 1992) ("Due to the plaintiffs' failure to set forth in their notice of claim any

allegations concerning negligent hiring, training, or supervision on the part of the municipal

defendants, these causes of action were properly dismissed.").

## H.    Loss of Marital Benefits and Loss of Consortium Claims

Defendant moves for summary judgment on the tenth and eleventh causes of actions in

the Amended Complaint on the grounds that: 1) Plaintiff's wife and children, who assert claims

for loss of marital benefits and loss of consortium respectively, did not file a notice of claim with

the Town, (*see* Ds' Mem. 15-16);[39] and 2) such claims are brought as derivative of Plaintiff's

---

[38]      Further, Plaintiff advanced the negligence claim more than two years ago and has taken no steps to correct
his failure to file a notice of claim or provided any excuse for that failure, so I would not be inclined to exercise my
discretion to excuse it even if I had the authority.

[39]      Even though Defendants list only the tenth cause of action in the heading of this argument in their brief, the
argument relates to Plaintiff's children as well, who assert a claim for loss of consortium in the Amended
Complaint. (*See* Am. Compl. 18.)

other claims, but those other claims do not support loss of consortium and marital benefits

claims, (*see* Ds' Cross-Motion Opp'n 12-13). Plaintiff does not dispute the failure to file a

notice of claim, and the record indicates that Plaintiff filed a notice of claim in his name only.

(*See* Sandel Decl. Ex. G.) Thus the tenth and eleventh causes of action fail for the same reason

as the ninth, as Plaintiff's wife and children did not file a notice of claim, and this Court is

without jurisdiction to grant them leave to do so. *See Dusenbury v. City of N.Y.*, No. 97-CV-

5215, 1999 WL 199072, at *2 (S.D.N.Y. Apr. 9, 1999) ("Despite the fact that [the wife's] loss

of consortium claim is derivative of her husband's negligence claim, it is still an independent

claim which must meet the New York State General Municipal Law 50-e and 50-i notice

requirements."); *accord Dixon v. City of N.Y.*, No. 03-CV-343, 2008 WL 4453201, at *22

(E.D.N.Y. Sept. 30, 2008) (granting summary judgment on wife's loss of consortium claim).

Further, I agree with Defendants' second argument. "A loss of consortium claim is a

derivative action that depends on the viability of the primary cause of action" or "the underlying

injury." *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 606 (E.D.N.Y. 2011); *see*

*Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) (wife's derivative loss of

consortium claim dismissed because husband's underlying claims dismissed). As discussed

above, the only claims of Plaintiff that survive Defendants' motion for summary judgment are

his Section 1983 claims based on violations of certain constitutional rights and his disability

discrimination claims. But none of these claims support a derivative loss of consortium claim.

*See O'Gorman v. Holland*, No. 97-CV-842, 2000 WL 134514, at *3 (S.D.N.Y. Feb. 3, 2000)

(federal civil rights violations and NYHRL claims); *Kreutzberg v. Cnty. of Suffolk*, No. 04-CV-

3835, 2006 WL 3370351, at *4 (E.D.N.Y. Nov. 20, 2006) (Section 1983); *Mohamed v. Marriott*

*Int'l, Inc.*, 905 F. Supp. 141, 159 (S.D.N.Y. 1995) (ADA). Thus, even if Plaintiff were allowed to file a late notice of claim, such a step would be futile.

Accordingly, Defendants' motion for summary judgment is granted as to the tenth and eleventh causes of action in the Amended Complaint.

## IV.   **Leave to Amend**

Plaintiff requests leave to amend the caption of this matter in order to substitute Pinn as John Doe One, and Cecile Sia – who is alleged to have been the court officers' immediate supervisor, the person responsible for the policies and procedures regarding hiring and training of court officers, and the person responsible for the video surveillance equipment at the time of the relevant incidents, (*see* P's Mem. 35-36) – as John Doe Two. Defendants argue that leave to amend should be denied on the grounds of prejudice, undue delay, and futility. (*See* Ds' Cross-Motion Opp'n Mem. 10-12.)

Leave to amend a complaint should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). At the summary judgment stage, leave to amend should be denied as futile "when the evidence in support of the plaintiff's proposed [amendment] creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law." *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) (summary order)

(internal quotation marks omitted).  "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir.1981).

As to Plaintiff's request to substitute Sia, Plaintiff cites no evidence to support his conclusory allegations that she was the court officers' supervisor, was responsible for the hiring and training policies and procedures, and was responsible for the video surveillance equipment. (*See* P's Mem. 36; P's Cross-Motion Reply 8.[40])  Further, the negligent training claim has been dismissed and there is no claim arising from the destruction of the video.  Finally, there is no individual liability under the ADA, and while such liability exists under Section 1983 and the NYHRL, Plaintiff has alleged no personal involvement by Sia in the deprivation of Plaintiff's rights. *See Burg v. Gosselin*, 591 F.3d 95, 98-99 (2d Cir. 2010) (Section 1983 claim requires personal involvement of defendant); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (affirming grant of summary judgment as to supervisory official because no evidence of personal involvement); *Tomka*, 66 F.3d at 1317 ("defendant who actually participates" may be held personally liable for discrimination under NYHRL).  Accordingly, Plaintiff's request for leave to substitute Sia as John Doe Two is denied as futile.

As to Pinn, I do not find undue prejudice in his substitution, despite Defendants' objections to the contrary.  Plaintiff has already taken Pinn's deposition, and I see no reason why Defendants, who also knew of Pinn's conduct since at least his deposition, should not be able to adequately prepare for trial if he is added as a defendant now.  Defendants argue that Plaintiff has been dilatory, as Pinn's deposition occurred on April 6, 2011, and Plaintiff knew his identity as early as October 22, 2010, the date of Defendants' initial disclosures.  (*See* Ds' Cross-Motion

---

[40]      "P's Cross-Motion Reply" refers to Plaintiff's Reply Memorandum of Law in Further Support of Plaintiff's Motion for Sanctions Due to Defendants' Spoliation of Material Evidence and Other Relief.  (Doc. 26.)

Opp'n 11.) But Defendants' initial disclosures identified Pinn only as someone likely to have discoverable information, not as the court officer who allegedly did not allow Plaintiff to bring his food into the courtroom or eat his food outside the courthouse. (*See* Doc. 15 Ex. A.) The delay from Pinn's deposition until Plaintiff requested leave to amend, slightly over six months, is not so long as to be considered dilatory or in bad faith, as the briefing schedule for the current round of motions was set at a conference on April 8, 2011, two days after Pinn's deposition. (*See* April 8, 2011 Minute Entry.)

Defendants also contend that Plaintiff does not seek to add Pinn as a defendant in his individual capacity, and thus any Section 1983 claim against him in his official capacity is duplicative. (*See* Ds' Cross-Motion Opp'n Mem. 12.) But Defendants do not cite law that requires a court to assume that a lawsuit is brought against individual defendants only in their official capacities unless the complaint specifies otherwise, and cases in this circuit suggest that an assumption of individual capacity claims is proper, *see, e.g.*, *Peterson v. City of Syracuse Police Dep't*, No. 09-CV-106, 2010 WL 1235392, at *4 (N.D.N.Y. Mar. 31, 2010) (assuming Section 1983 claims brought against defendants in individual capacities); *Davis v. Cnty. of Nassau*, 355 F. Supp. 2d 668, 675-76 (E.D.N.Y. 2005) (same). Thus, I assume that Plaintiff intends to sue Pinn in his individual capacity, given that the Amended Complaint is replete with actions ascribed to Pinn himself. And as Plaintiff's state-law disability discrimination claim and three of his Section 1983 claims against Pinn in his individual capacity survive summary judgment, amendment would not be futile. Accordingly, Plaintiff is granted leave to substitute Pinn.

V.    **Conclusion**

For the reasons above, Defendants' motion for summary judgment on the first (ADA) and fifth (Rehabilitation Act) causes of action is DENIED as against the Town and GRANTED as against the Individual Defendants.  Defendants' motion on Plaintiff's state disability discrimination claim in the sixth cause of action is DENIED as to all Defendants.  Defendants' motion for summary judgment on the third (Section 1981), fourth (Title VI), seventh (assault and battery), eighth (unlawful imprisonment), ninth (negligence), tenth (loss of marital benefits), and eleventh (loss of consortium) causes of action, as well as on Plaintiff's equal protection claim in the second (Section 1983) cause of action and national origin and religious discrimination claims in the sixth (state-law discrimination) cause of action, is GRANTED.  Defendants' motion for summary judgment is DENIED as to the right-of-access, procedural due process, and substantive due process claims in the second (Section 1983) cause of action.  Plaintiff's motion for sanctions is GRANTED; his motion for leave to amend the Amended Complaint is GRANTED IN PART (as to Pinn) and DENIED IN PART (as to Sia); and his motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 13, 17); terminate Irna, Diana, Camilla, and Rebecca Kravtsov as plaintiffs in this case; and substitute Reginald "David" Pinn for John Doe One in the caption of the case.

The parties are directed to appear for a conference on August 17th, 2012 at 10:00 a.m. As described above, Plaintiff is to submit the following: 1) one week before the date of the conference, a letter of not more than three pages explaining the basis for his remaining Section 1983 claims; and 2) within 14 days of the date of this Order, a submission regarding attorneys' fees and costs with respect to spoliation.

**SO ORDERED.**

Dated: July 9, 2012
　　　　White Plains, New York

_____
　　　　　　CATHY SEIBEL, U.S.D.J.